# 22-1242(L)

To be argued by:
**KENDRA L. HUTCHINSON**

United States Court of Appeals
For the Second Circuit

————————

Docket Nos. 22-1242(L), 22-2550(CON)

————————————

UNITED STATES OF AMERICA,

*Appellee,*

-against-

MICHAEL AVENATTI,

*Defendant-Appellant.*

————————————————

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF FOR DEFENDANT-APPELLANT
MICHAEL AVENATTI**

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8731

*Attorney for Defendant-Appellant*
**MICHAEL AVENATTI**

**KENDRA L. HUTCHINSON**,
*Of Counsel*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**.......................................................... iv

**STATEMENT OF JURISDICTION**.....................................................1

**QUESTIONS PRESENTED**............................................................1

**STATEMENT OF THE CASE** ..........................................................2

I.    Procedural Posture.......................................................2

II.    Statement of Facts ......................................................3

    A.    The Trial Evidence......................................................3

        1.    Avenatti Secures a Favorable Book Deal For Clifford.....3

        2.    Avenatti's Continued Efforts on Behalf of Clifford Throughout 2018.................................................7

        3.    Clifford's Performance Under the Publishing Contract and Receipt of the Second Payment...............................9

        4.    The Third Payment and Breakdown of Clifford's and Avenatti's Relationship....................................13

        5.    Clifford's Animus Toward Avenatti and Unusual Beliefs ...............................................................19

    B.    The Lengthy, Detailed Jury Instructions Concerning the Ethical Obligations of Attorneys....................................21

    C.    The Court's Coercive Instruction in Response to the Final Jury Note, Shortly Before the Verdict Is Announced ................................................................27

    D.    Sentencing ..............................................................31

    E.    The Restitution Order.............................................34

**SUMMARY OF ARGUMENT** ..........................................................35

i

**ARGUMENT**.......................................................................**37**

I.    The Court Erred in Delivering a Lengthy and Prejudicial
      Final Charge on the Professional Duties of Lawyers That
      Was Largely Irrelevant, Risked Serious Juror Confusion,
      Turned the Criminal Trial Into an Attorney Grievance
      Proceeding, and Improperly Injected the Court's Own Beliefs
      and Commentary Into Deliberations..............................................37

      A.    Standard of review ...................................................38

      B.    Reversal is Required Due to the Highly Prejudicial
            Jury Instruction Regarding the Professional Duties of
            Lawyers ...................................................................38

II.   The Court's Supplemental Instruction In Response to the
      Jury's Second Declaration of Deadlock, Which Singled Out
      the Holdout Juror and Insisted That a Verdict Be Returned,
      Was Impermissibly Coercive ........................................................48

      C.    Standard of review ...................................................48

III.  The Court's Supplemental Instruction In Response to the
      Jury's Second Declaration of Deadlock, Which Singled Out
      the Holdout Juror and Insisted That a Verdict Be Returned,
      Was Impermissibly Coercive ........................................................49

      D.    Standard of review ...................................................50

      E.    Evaluated in Context, from the Viewpoint of the
            Minority Juror, the Supplemental Instruction Singled
            Her Out and Was Coercive ........................................50

IV.   The District Court Erred in Determining that the Loss
      Amount Was $297,500 Because the Second Book Payment of
      $148,750 Was Returned and Because the Loss Amount
      Should Have Been Reduced By the Value of Services
      Avenatti Rendered to Clifford.......................................................58

      A.    Standard of review. ..................................................59

      B.    The Credits Against Loss Rule. .................................59

      C.    Avenatti Returned the Second Book Payment Before
            the Alleged Crime Was Detected or About to Be
            Detected ...................................................................60

      D.     Avenatti Provided Substantial Legal Services to Clifford That Should Have Resulted in a Credit Against the Loss Amount ...................................................... 63

      E.     Vacatur and Remand Is Necessary. ..................................... 67

V.    The Restitution Order Must Be Corrected to Conform to the Court's Oral Sentence and Written Judgment ............................. 68

**CONCLUSION** ....................................................................... **71**

**CERTIFICATE OF SERVICE** ............................................... **72**

**CERTIFICATE OF COMPLIANCE** ....................................... **73**

iii

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*Gall v. United States*, 552 U.S. 38 (2007)........................................................59

*Glasser v. United States*, 315 U.S. 60 (1942)....................................................44

*Hudson v. New York City*, 271 F.3d 62 (2d Cir.2001)) ..............................42

*Jenkins v. United States*, 380 U.S. 445 (1965).............................................56

*Lowenfield v. Phelps,* 484 U.S. 231 (1988) ............................................ 51, 54

*People v. Stein*, 94 Cal. App. 3d 235 (Ct. App. 1979)....................................42

*Santa Maria v. Metro-N. Commuter R.R.*, 81 F.3d 265 (2d Cir. 1996) ...44

*Smalls v. Batista,* 191 F.3d 272 (2d Cir. 1999) .............................................50

*Spears v. Greiner*, 459 F.3d 200 (2d Cir. 2006).............................................55

*State v. Mahoney*, 188 N.J. 359, 908 A.2d 162 (2006) .................................42

*United States v. A-Abras*, Inc., 185 F.3d 26 (2d Cir. 1999) ......................69

*United States v. Allen*, 127 F.3d 260 (2d Cir. 1997)....................................43

*United States v. Assi*, 748 F.2d 62 (2d Cir. 1984)........................................44

*United States v. Barnes*, 125 F.3d 1287 (9th Cir. 1997)) .................... 63, 66

*United States v. Brennan*, 395 F.3d 59 (2d Cir. 2005) ...............................59

*United States v. Byors*, 586 F.3d 222 (2d Cir. 2009)................. 60, 63, 65, 66

*United States v. Cavera,* 550 F.3d 180 (2d Cir. 2008) (en banc)..............59

*United States v. Crispo,* 306 F.3d 71 (2d Cir. 2002). ........................... 49, 50

*United States v. DeMartino*, 112 F.3d 75 (2d Cir. 1997). .........................68

*United States v. DeSisto*, 289 F.2d 833 (2d Cir. 1961) ...............................44

*United States v. Dove*, 916 F.2d 41 (2d Cir. 1990).......................................38

iv

*United States v. Drayer*, 364 F. App'x 716 (2d Cir. 2010) ..........................62

*United States v. Fagans*, 406 F.3d 138 (2d Cir. 2005)................................67

*United States v. Fareri*, 712 F.3d 593 (D.C. Cir. 2013) ....................... 69, 70

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011) ............................45

*United States v. Guerrero*, 910 F.3d 72 (2d Cir. 2018) ...............................67

*United States v. Haynes*, 729 F.3d 178 (2d Cir. 2013).............. 36, 51, 56, 57

*United States v. Iodice*, 525 F.3d 179 (2d Cir. 2008) ..................................62

*United States v. Jacques*, 321 F.3d 255 (2d Cir.)................................. 69, 70

*United States v. Klein*, 543 F.3d 206 (5th Cir. 2008)................................67

*United States v. Kopstein*, 759 F.3d 168 (2d Cir. 2014) ........... 38, 42, 43, 47

*United States v. Leon*, 663 F.3d 552 (2d Cir. 2011) ............................. 59, 66

*United States v. Marquez*, 506 F.2d 620 (2d Cir. 1974) ...................... 68, 69

*United States v. McCracken*, 488 F.2d 406 (5th Cir. 1974)........... 40, 45, 46

*United States v. McDonald,* 759 F.3d 220 (2d Cir. 2014) ...........................55

*United States v. Nagle*, 803 F.3d 167 (3d Cir. 2015) ..................................60

*United States v. Persico*, 349 F.2d 6 (2d Cir. 1965). ...................... 38, 44, 47

*United States v. Pirro*, 9 Fed. Appx. 45 (2d Cir. 2001)...............................51

*United States v. Ramirez*, 344 F.3d 247 (2d Cir. 2003)...............................69

*United States v. Rosario*, 386 F.3d 166 (2d Cir. 2004) ...............................69

*United States v. Rowland*, 826 F.3d 100 (2d Cir. 2016)...............................66

*United States v. Skys,* 637 F.3d 146 (2d Cir. 2011)....................................59

*United States v. Thomas*, 299 F.3d 150 (2d Cir. 2002) ....................... 68, 70

*United States v. Tourine*, 428 F.2d 865 (2d Cir. 1970)................................45

*United States v. Vargas-Cordon*, 733 F.3d 366 (2d Cir. 2013) .................50

*United States v. Wernick,* 691 F.3d 108 (2d Cir. 2012) ..............................59

*United States v. Wilkerson*, 361 F.3d 717 (2d Cir. 2004)............................46

*United States v. Wisecarver*, 644 F.3d 764 (8th Cir. 2011) .......................40

## Statutes                                            Page(s)

18 U.S.C. § 1028A .........................................................................................2

18 U.S.C. § 1343..............................................................................2, 37, 41

18 U.S.C. § 3231 .............................................................................................1

28 U.S.C. § 1291.............................................................................................1

## United States Sentencing Guidelines              Page(s)

U.S.S.G. § 2B1.1(b)(1)...................................................................36, 58, 66

U.S.S.G. § 2B1.1(b)(1) app. n. 3(E)(i)(II)....................................58, 59, 63

## Other Authorities                                  Page(s)

California Rule of Professional Conduct 1.4................................................46

Fed. R. Crim. P. 43(a) ..................................................................................68

Sand, Modern Federal Jury Instructions § 44.04 ........................................39

## STATEMENT OF JURISDICTION

Michael Avenatti appeals from a final judgment of conviction entered in the United States District Court for the Southern District of New York on June 2, 2022, and an order of restitution entered on September 23, 2022 (3A.642-49, 651-55).[1] Notices of appeal were timely filed (3A.650, 656). This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. The district court had jurisdiction under 18 U.S.C. § 3231.

## QUESTIONS PRESENTED

I.  Whether the court erred in delivering a lengthy and prejudicial final charge on the professional duties of lawyers that was largely irrelevant, risked serious juror confusion, turned the criminal trial into an attorney grievance proceeding, and improperly injected the court's own beliefs and commentary into deliberations.

II. Whether the court's supplemental instruction in response to the jury's second declaration of deadlock, which singled out the holdout juror and insisted that a verdict be returned, was impermissibly coercive.

---

[1] Appendix volumes are cited "1A," "2A," etc. Condensed transcript pages are cited "T." Government and defense exhibits are cited "GX" and "DX," respectively. The Special Appendix is cited "SPA." Entries on the district court docket, *United States v. Avenatti*, 19-cr-374 (S.D.N.Y.), are cited "DE."

1

III.   Whether the district court erred in determining that the loss amount was $297,500 because the second book payment of $148,750 was returned and because the loss amount should have been reduced by the value of services Avenatti rendered to Clifford.

IV.   Whether the restitution order must be corrected to conform to the court's oral sentence and written judgment.

## STATEMENT OF THE CASE

### I.   Procedural Posture

A grand jury in the Southern District of New York indicted Avenatti for wire fraud, 18 U.S.C. § 1343, and aggravated identity theft, 18 U.S.C. § 1028A. Avenatti was convicted of both counts following a jury trial. The district court (Hon. Jesse M. Furman) sentenced Avenatti principally to an aggregate term of 48 months, with 18 months to run concurrently with his sentence imposed in *United States v. Avenatti*, 19-cr-373 (S.D.N.Y.), and ordered restitution of $148,750.

## II.   Statement of Facts

### A.   <u>The Trial Evidence</u>

#### 1.   *Avenatti Secures a Favorable Book Deal For Clifford*

In February 2018, Stephanie Clifford[2] did not have money but needed a lawyer to help her nullify a non-disclosure agreement with then-President Donald Trump (2A.288). She was "out of options" – some lawyers refused to represent her unless she paid a substantial sum upfront, and others were afraid of taking on the case (2A.334-35).

On February 26, 2018, she was introduced to Michael Avenatti, who agreed to consider representing her (2A.288-89, 335). They met again the next day and Avenatti said he would represent her for $100, set up a crowd-funded legal defense fund, and take a percentage of any proceeds from the Trump lawsuit (2A.289). According to her, they would discuss a book deal later (2A. 298).

That day, February 27, 2018, Clifford paid Avenatti $100 and signed a retainer agreement with his firm that read, in pertinent part:

> 2.    SCOPE OF SERVICES. Clients are hiring
> Attorney to represent Clients in connection with
> (a) providing Clients with counsel and advice

---

[2] Clifford, an adult entertainer, was commonly known by her stage name, Stormy Daniels (2A.288; T.884).

relating to Clients prior negotiation and execution of various alleged agreements concerning Clients' prior relationship with Donald Trump; (b) providing Clients with counsel and advice concerning various media appearances; and (c) assisting Clients with voiding various alleged agreements concerning Clients' prior relationship with Donald Trump. Attorney will provide those legal services reasonably required to represent Clients and take reasonable steps to inform Clients of progress and to timely respond to Clients' inquiries. . . .

3.    CLIENT'S DUTIES. Clients agree to be truthful with Attorney, to cooperate, to keep Attorney informed of developments, to abide by this Agreement, and to pay bills for reasonably incurred costs on time.

4.    LEGAL FEES, COSTS AND BILLING PRACTICES. For legal services rendered, Attorney will receive (a) an [*sic*] one-time payment of $100.00 and (b) Attorneys' standard hourly fees and out-of-pocket costs if a legal defense fund is established to benefit Clients and has sufficient funds to pay such fees and costs. In addition, in the event Attorney assists Clients in finalizing any book or media opportunity that results in Clients being paid, Attorney and Client agree that Attorney shall be entitled to a reasonable percentage to be agreed upon between Clients and Attorney.

(2A.289, 291; 3A.661-62 (GX 3)).

Avenatti filed Clifford's lawsuit on March 6, 2018, and the two became famous overnight (1A.135-37). Building on this wave of national

4

interest and Clifford's highly-publicized "60 Minutes" interview that month, Avenatti began meeting with literary agent Luke Janklow, of Janklow & Nesbit Associates, and pushed hard to negotiate a favorable book deal for Clifford (1A.91-93, 137, 147-53, 282, 345). On April 11, Clifford signed a publishing contract with St. Martin's Press for a forthcoming book, ultimately entitled *Full Disclosure* (2A.292-93, 3A.746-80 (GX 102)). On April 13, she signed a literary agent contract with Janklow (2A.295-96, 3A.781-84 (GX 103)). Thereafter, Avenatti worked on her behalf in connection with publishing and promoting *Full Disclosure* (2A.345).

Per the book deal, St. Martin's would pay Clifford an $800,000 advance: $250,000 at signing; $175,000 upon delivery and acceptance of the final manuscript; $175,000 upon publication if she completed a three-week publicity requirement and honored media restrictions; and a final $200,000 payment, 6 to 12 months after publication (2A.292-93, 3A.746-80 (GX 102)). Each payment would be made by the publisher to

the agent, which would take its commission and pay Clifford the remainder (1A.89).[3]

Upon signing, St. Martin's Press paid Janklow & Nesbit the first $250,000 payment; Janklow immediately wired Clifford's portion into her business checking account, the details of which had been provided by Clifford to Avenatti (1A.97, 2A.94, 370). Clifford was fine with Janklow taking his commission although they had not yet signed the contract; they had verbally agreed to this (1A.150, 2A.334).

That day, she claimed at trial, she spoke with Avenatti and, in contrast to the fee agreement, he assured her that "he would never take a penny from her for the book" and would be compensated only from the "big payday from winning against Trump" and the legal defense fund (2A.295). According to her, they never subsequently agreed he would get a portion of the book money (2A.290, 319). She admitted, however, that she did not have a single text, email, or voicemail corroborating this, and that they did, in fact, come to at least one other purely verbal

---

[3] Janklow's commission was 15% in the contract (3A.781-84). In May 2018 Avenatti proposed and Janklow agreed to pay Avenatti a 2.5% referral fee (3A.96).

understanding not reflected in the retainer agreement, *i.e.*, about the Trump contingency fee arrangement (2A.319, 335).

> 2.  *Avenatti's Continued Efforts on Behalf of Clifford Throughout 2018*

All in all, as even Clifford agreed at trial, Avenatti and his firm did "a lot of work" for her in 2018, work that office manager Judy Regnier described as unusual and beyond the scope of most attorney-client agreements (1A.185, 193, 196-97, 2A.337-38). In addition to negotiating the book deal, he set up interviews, reviewed the contracts, advised her on hiring a literary agent, accompanied her to meetings, worked on the cover, wrote the forward, arranged the audiobook, reviewed the manuscript, and reviewed the book and epilogue for any legal issues (2A.336, 39-96).

Avenatti also provided representation and advice in numerous legal matters. In response to her lawsuit, then-President Trump counterclaimed that Clifford owed $20 million in damages; Avenatti represented her (2A.358). In July, Clifford's husband drained her business bank account, took her daughter, and filed for divorce and sole custody in Texas (2A.348-49). Avenatti helped Clifford locate her

daughter in Missouri, advised her in the divorce proceedings, found her a Texas divorce lawyer, and compiled asset lists with her (2A.349).

Also in July, Clifford was arrested in Ohio; Avenatti spoke to her publicist all night and retained a lawyer for her, using funds from the legal fund, and within 24 hours the charges were dismissed (2A.351). Avenatti's firm subsequently prepared a lawsuit for damages resulting from the arrest, and she ultimately received a $450,000 settlement (2A.337). Avenatti also represented her in November 2018 when she believed friends stole more than $26,000 from her, after she gave them money in order to hide assets from her husband (2A.361).

In total, all these matters plus others took up a tremendous amount of firm resources and incurred approximately $2.4 million in fees and expenses by November 30 (1A.198, 3A.658 (GX 2)). As of that date, the legal defense fund had taken in about a quarter of that amount, $587,415 (1A.232, 2A.341, 3A.658). Donations to the fund essentially ceased in November; nevertheless, Avenatti and the firm continued to represent Clifford and advance costs for her through January 2019 (1A.213).

### 3. Clifford's Performance Under the Publishing Contract and Receipt of the Second Payment

Clifford finished the *Full Disclosure* manuscript in July 2019 (2A.296). That month, she sat for a Dutch television interview, did publicity for local clubs, and considered appearing on the television show, "Big Brother" (1A.131, 2A.374). The publisher was dismayed; contractually, Clifford was to be in a media blackout between contract signing and publication (1A.110, 2A.374). In fact, St. Martin's had been concerned about her meeting the publicity requirements all along; even on April 11, the date they signed, she announced she would do a major interview (on "The View") without clearing it with them (2A.140, 154). She also changed her mind about a particular book cover that everyone else – St. Martin's, Janklow, and Avenatti – had agreed on, causing a "scramble" (1A.122-23, 135, 396).

Also the same month, as noted, Clifford's bank account was drained by her husband when he left her; as a result, Clifford told Avenatti mid-month that she closed this account (2A.348-50, 5A.1243 (DX ST12)). Strapped for cash, Clifford texted Avenatti on July 29 asking about the second book payment, and he responded that she should receive it soon (2A.296).

9

On July 31, Avenatti urged Janklow to release the second payment quickly, and Janklow passed the message on to Elizabeth Beier, their St. Martin's editor (1A.99-100, 2A.371). Beier requested that Daniel's second payment be released that same day (1A.100-02, 2A.371-73). Avenatti sent Janklow an email changing the banking information for Clifford to a trust account in her name at his firm, as Clifford had closed the old account (1A.102, 3A.813). Janklow responded that he needed authorization from Clifford (1A.103).

On August 1, Avenatti emailed Janklow a letter seemingly from Clifford requesting the banking change because the prior account had been closed (2A.104-05, 3A.818-20 (GX 213)). Clifford did not sign this letter or know of it (2A.316). Judy Regnier, Avenatti's office manager, testified that she copied Clifford's signature from the retainer agreement and inserted it into the letter at Avenatti's request, as she had regularly done for other clients in the past; Avenatti told Regnier that Clifford was having money problems and "personal issues" and needed her funds routed to a different account (2A.168, 199).[4] Believing

_____

[4] Avenatti began representing himself *pro se*, after an inquiry by the district court, midway through Regnier's testimony (1A.181).

10

that Clifford had signed the letter and authorized payment to the client trust account, Janklow wired the $148,750 to that account in two payments on August 1 and 3 (2A.104-05, 234).[5]

Starting on August 23, Avenatti sent several texts to Clifford asking for approval of potential audiobook readers (2A.297). Clifford initially did not respond but finally texted on August 27 that she found it "annoying" the publisher wanted answers but had not sent the second payment (2A.297 (T.923)). Avenatti did not respond (2A.297). On August 30, Avenatti texted her, promising "updates"; the two spoke and he said that the second payment had not been sent yet (2A297-98).

That weekend, Avenatti met up with his friend, fellow lawyer Sean Macias, at a legal conference in Las Vegas (1A.246-48).[6] Avenatti

---

[5] Special Agent Jeremy Rosenman testified that over $63,000 of this went to Clifford's security detail, that the remainder was transferred to other Avenatti firm accounts, and that there did not appear to be expenses associated with Clifford paid out of these other accounts (2A.237). According to Regnier, however, some costs associated with Clifford's representation were paid out of non-trust firm accounts (2A.210).

[6] At the time of trial, Macias was the divorce lawyer for Avenatti's estranged wife, and had requested a proffer agreement before speaking with the government (2A.558, 274). Clifford approached him for representation in February 2018 but Macias declined and introduced her to Avenatti instead (2A.247).

seemed melancholy and told him that Clifford was upset because the publisher had not paid her (AA.249).

On September 4, Clifford texted Avenatti with information about a new bank account to use for upcoming payments, as she wanted to hide assets from her estranged husband (2A.298, 350). That day, claimed Macias, Avenatti showed up at Macias's office saying he needed a quick $250,000 bridge loan (1A.250). Macias ultimately arranged for a close friend, Mark Geragos, Esq., to loan Avenatti the money and wire it to him the next day, September 5 (1A.250-53). Macias claimed that Avenatti said he needed the money for payroll and rent, and denied the money was related to funding Avenatti's presidential campaign; however, on cross-examination, he agreed he had been very enthusiastic about Avenatti running for president; he wanted Avenatti to appoint him ambassador once he won; Geragos referred to Avenatti as "El Presidente" during loan discussions; and Macias sent Avenatti texts stating, "I am getting you some do re me so you can run like a banshee" (1A.253, 256, 5A.1214-15 (DX AB, AD)).

Clifford texted again on September 5 about the second payment (2A.299). Avenatti gave her a cashier's check that day for $148,750,

12

saying it was the second payment (minus the agent commission) and that the publisher had mailed it to him (2A.299). Regnier testified that she had purchased the cashier's check with funds from an Avenatti firm account at his direction (1A.173).[7]

### 4. The Third Payment and Breakdown of Clifford's and Avenatti's Relationship

In the beginning of September, Clifford told the press she would sit for a major interview; Janklow and St. Martin's were again very angry because of the pre-publication media blackout requirement (1A.124). Thus, on September 13, Avenatti asked Janklow to accelerate Clifford's third payment, explaining that she had money problems and that payment would motivate her to cease the prohibited publicity (1A.107, 110). Janklow relayed this to Beier, the St. Martin's editor, who agreed and requested a check on September 18 (1A.107, 2A.374).

---

[7] Regnier also testified that Avenatti's firm was in bankruptcy (although the proceeding eventually was dismissed) and had financial difficulties starting in July 2018, including problems meeting payroll, health insurance premiums, and day-to-day expenses (2A.169-70, 220-21). The firm ultimately was evicted and healthcare coverage discontinued due to nonpayment in late 2018 (2A.170, 183 (T.419, 471-72)). However, Regnier also agreed that bank records admitted by the defense showed millions of dollars of deposits entering the firms' operating and client trust accounts throughout that year (2A.214-17 (DX T-AA)). The firm had also recently obtained a $454 million verdict, the largest that year in California, although it had not received these funds by February 2019 and there was no guarantee it would (2A.190, 218).

13

Janklow wired the third $148,750 payment to the Clifford trust account early, on September 17 (1A.109, 234).[8]

On October 1, the day before *Full Disclosure* was published, Clifford texted Avenatti, "That means I get paid tomorrow, right," attaching a screenshot of the contract with the third payment circled (2A.300, 375). Avenatti responded, "Yes" (2A.300). Following this, she texted Avenatti a number of times throughout October and November about the payment (2A.300). Avenatti responded affirmatively, via text and on the phone, saying that he was working on it and they needed to meet the publicity requirements (2A.300).

In early October, Clifford refused to do any more publicity for *Full Disclosure*, and Beier recalled having to cancel an interview so Cliffordcould get a manicure (2A.393-94). Later that month, St. Martin's, which had wanted the publicity campaign to be national and

---

[8] Special Agent Rosenman testified that the entire amount was transferred to another Avenatti trust account (2A.237). Payments in the amount of $31,152 were made directly from this account to, among others, Brandon Parraway and the DeAnda Law firm, and a different Avenatti client (2A.238). $89,100 was transferred to other Avenatti accounts, which were then used to pay for payroll, health insurance premiums, bank fees, and various expenses including airfare, car rentals and services, food, hotels, insurance, legal, etc. (2A.238-40). Rosenman did not know whether certain of these expenses or payments were related to Avenatti's representation of Clifford (2A.242-43).

"splashy," began considering withholding the fourth payment based on Clifford's failure to meet the publicity requirements (2A.375, 390).

Clifford and her publicist reached out to Beier several times in November about payment, and Janklow was looped in, but neither responded (1A.112, 2A.302, 386, 390). Near the end of November, Clifford testified, Avenatti told her several times over text that St. Martin's was balking because she had not honored the publicity requirement, and so he thought a demand letter would be necessary (2A.300, 303).

On November 28, people on social media began attacking Clifford about a second legal fund Avenatti had set up; without talking to him, Clifford posted on social media that she had not known of this fund (2A.304). Avenatti texted her that day and the next, providing an explanation for the second fund, saying her attack on him was unfair, and asking to talk (2A.304-05). In Clifford's texts back, she referenced not being paid by the publisher or reimbursed for security costs, the fact that checks he wrote from the legal fund to her bodyguards had bounced, and demanded a list of legal fund expenses (2A.305).

15

Avenatti sent Clifford a letter on November 30, created by Regnier using the Avenatti firm's financial software and bank records, providing an accounting of the legal services and expenses incurred thus far (1A.191, 2A.305-06, 3A.658 (GX 2)). As discussed, four attorneys of the firm had worked 2,381 hours on 10 matters for Clifford, totaling $1,638,390 at standard hourly rates, and the firm had incurred $635,434.18 in out-of-pocket expenses (3A.658).[9] The accounting made sense to Clifford: on the same day, she and Avenatti texted about the third payment, and Avenatti said he had not forgotten about it (2A.306).

Throughout December 2018 and January 2019, Clifford continued to text Avenatti about the money, sometimes proposing that she release bombastic, over-the-top statements about the publisher (2A.307-10). Avenatti texted Clifford back that he was making progress and threatening litigation against St. Martin's (2A.307-10).[10]

―――――――――――――――

[9] Although the book deal was not explicitly referenced in this letter, a number of expenses it set forth related to media, publicity, and security while Clifford was promoting the book (2A.306).

[10] Beier was unaware of Avenatti ever having sent a demand letter or threatened litigation (2A.388-89).

16

On February 4, 2019, Clifford texted Avenatti and they spoke (2A.310). Avenatti said the publisher might send a check again and was proposing a "settlement," *i.e.,* paying a lower total lump sum for the third and fourth payments because they were unhappy with her book sales (the book lost hundreds of thousands of dollars) and publicity (2A.310). Clifford declined, and followed up with texts on February 7 and 9 asking about the check, but Avenatti did not respond (2A.311). Clifford's publicist sent an email to St. Martin's in February but received no response (2A.387).

On February 12, Clifford and Avenatti texted, and Avenatti said, "We are resolving" (2A.311). On February 13, Clifford texted Avenatti that she had sent texts to everyone at St. Martin's, would continue to text until she heard back, and would post to social media if the issue was not resolved in 24 hours (2A.311-12). She texted Avenatti on the morning of February 14 that she was about to give an interview and warn authors about the publisher (2A.312). She also noted that reporters were questioning her regarding Avenatti's files and money allegedly seized by law enforcement (2A.312). Avenatti responded that she had nothing to worry about, gave her a sample press statement, and

17

enthusiastically agreed to help her obtain her money (2A.312 (T.983-85)).

Avenatti texted Clifford a number of times between February 15 and 18, stating that he had "good news re the book" and asking to talk on the phone (2A.313). Clifford never responded (2A.313). Meanwhile, between February 13 and 19, Clifford repeatedly tried to reach Beier and Janklow on the phone (1A.113, 117-18). Clifford ultimately spoke to Beier and received proof from Janklow that the third payment had been wired to her Avenatti trust account (1A.118-19, 2A.313-16, 389, 3A.846-52 (GX 238)).

On February 19, Avenatti sent Clifford a letter at 11:10 a.m. stating that his firm had decided to terminate representation because she had been non-responsive about a "multitude of issues," including "the book proceeds and payments, your allegations against [REDACTED], the situation with your termination of your security detail, and the status of the Columbus litigation and our attempts at settlement" (2A.316, 334, 3A.663-64, 5A.1216 (GX 4, DX AE)). Avenatti had not made the decision lightly, but was forced to due to "lack of communication and responsiveness as to time sensitive matters,

18

including financial issues; your prior false accusations (which you chose to make public before communicating them to me — I found out from a reporter); and your general lack of appreciation for our work and the thousands of hours we have devoted to you, which we have largely done for free at great expense to me and my firm" (3A.663-64).

In texts sent around 2:00 p.m. that day, Clifford texted Avenatti the proof of payment, confronted him about her not having received it, and said she did not know he had a trust account in her name (2A.314). Avenatti responded, "Let me find out if we even received this payment," and "Let me find out what is going on" (2A.314). Clifford texted him around 4:30 p.m. Eastern Time that she had retained a lawyer, Clark Brewster, and that Avenatti should speak to him (2A.316).

### 5. *Clifford's Animus Toward Avenatti and Unusual Beliefs*

Clifford, who claimed that she never lied and had perfect, photographic memory, and blamed Avenatti for a $300,000 judgment that Trump obtained against her in a second lawsuit (2A.363). She had made a number of "angry" public statements about Avenatti, as recently as four months before trial, including repeated, graphic references to

19

how she hoped he would be painfully raped many times in prison
(2A.318, 327).

Testimony was also elicited about Clifford's unusual beliefs. At the
time of trial, Clifford had been working on a potential television show
for two years, "Spooky Babes," concerning paranormal activity (2A.318).
Even before the show, she was interested in the paranormal; she
purported to be a tarot card reader and medium who could
communicate with spirits (2A.318, 332).

Around the time she started accusing Avenatti of a crime, in
March 2019, Clifford suffered inexplicable, frightening experiences in
her New Orleans home, including "physical attacks from invisible
assailants," "poltergeist[s]," "shadow figures," and "unexplainable
sounds and voices that prowled [her] home" like "a predatory animal"
(2A.329). She learned that her home contained a "portal" used by a
"dark entity"; one time, it came through the portal, held down her then-
partner, caused his eyes to turn black, and made him scream at her and
choke her so hard that he broke her collarbone (2A.329). These
experiences caused her partner to question her sanity. Later that year,
she also saw a ghostly woman in her home, crying over a child who had

passed away and cutting her wrists (2A.329). When Clifford looked

down at herself, her own arm was covered in blood (2A.329). At the

time, she believed she was crazy (2A.329). Clifford became obsessed

with this home, which she thought was female and had a name

(2A.330). She ultimately had to move out of the home because she

believed it gave her a brain blockage and made her bleed from her eyes,

ears, and nose (2A.330-31). Clifford would still occasionally drive to the

house, however, and talk to it (2A.330).

Finally, Clifford also had a relationship with a haunted doll

named "Susan," who would converse with Clifford, call her "mommy,"

and move of her own accord (2A.331). Clifford "absolutely" stood behind

all of these experiences, and asserted at trial they were true (2A.328).

### B. <u>The Lengthy, Detailed Jury Instructions Concerning the Ethical Obligations of Attorneys</u>

The court submitted one count each of wire fraud and aggravated

identity theft. As to wire fraud, it instructed the jury on the good faith

defense, *i.e.,* that a defendant's good faith, although mistaken, belief

that he was entitled to take the property was a complete defense to wire

fraud charges, and that, therefore, the government had the burden to

disprove good faith beyond a reasonable doubt (2A.255).

21

Also as to wire fraud, the court gave the following instructions:

Count One — Professional Duties

Before we turn to the third and final element of wire fraud, I want to explain certain professional duties of lawyers that you may consider in connection with the first two elements of Count One.

As you know, during most of the events relevant to this case, Mr. Avenatti served as Ms. Clifford's lawyer. During that time, the defendant was a member of the California Bar and therefore, under California law, owed certain duties to Ms. Clifford as his client. In considering the first two elements . . . of Count One, you may consider whether the defendant breached any of these professional obligations to Ms. Clifford.

You should keep in mind that proof that the defendant violated one or more of his professional duties under California law does not, without more, mean that he committed wire fraud. Nevertheless, such proof may be considered by you in determining whether the defendant engaged in a scheme to defraud and whether he did so with knowledge and an intent to defraud.

Duty of Loyalty and Scope of Authority

Lawyers owe a duty of loyalty to their clients. This means that, when acting on behalf of a client, a lawyer must put his client's interests first. The misappropriation of client funds is a particularly serious violation of a lawyer's ethical duty of loyalty.

Under California law, it is the client who defines the objectives of the representation and not the lawyer. A lawyer cannot act without the client's authorization, and a lawyer may not take over decision-making for a client, unless the client has authorized the lawyer to do so. A lawyer must abide by a client's decisions concerning the objectives of the representation and shall reasonably consult with the client as to the means by which the objectives are to be pursued.

Subject to requirements of client confidentiality, a lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. The client has the ultimate authority to determine the purposes to be served by the legal representation, however, within the limits imposed by law and the lawyer's professional obligations.

A lawyer retained to represent a client is authorized to act independently on behalf of the client in making routine or tactical decisions. By contrast, a lawyer is not authorized merely by virtue of the lawyer's retention to impair the client's substantial rights (such as the right to settle a case or to stipulate to something that would eliminate a claim or defense) or impair the claim itself.

<u>Duty of Reasonable Communication</u>

Lawyers are required to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services, and to respond promptly to reasonable status inquiries of clients. A lawyer must also reasonably consult with the

23

client about the means by which the lawyer will try to achieve the client's goals and objectives; keep the client reasonably informed about significant developments relating to the representation, including promptly complying with reasonable requests for information and for copies of significant documents when necessary to keep the client so informed; and explain a matter to a client to the extent reasonably necessary to permit the client to make informed decisions during the representation. "Reasonably" refers to the conduct of a reasonably prudent and competent lawyer. A lawyer owes his client a duty of full and frank disclosure of all relevant information relating to the subject matter of the representation.

### Written Fee Agreements

Under California law, a lawyer is generally required to put fee agreements with clients in writing. In particular, whenever it is reasonably foreseeable that the total expense to a client, including an attorney's fees, will exceed $1,000, the contract for the attorney's services must be in writing and must contain the basis for the fees to be charged by the attorney, such as hourly rates, flat fees, or other arrangements.

Additionally, all bills for services rendered by an attorney must include the amount of fees and the method by which the fees are calculated, and must clearly identify costs and expenses incurred on behalf of a client and the amount of the costs and expenses.

### Money Received on Behalf of a Client

24

Lawyers in California are also required to adhere to rules regarding the safekeeping of their clients' funds. When a lawyer receives any money on behalf of a client, the lawyer must deposit the money into a bank account labeled as a client trust bank account and must promptly notify the client of the receipt of the funds. Furthermore, when a client asks for money that a lawyer holds for the client in a trust account, the lawyer must promptly provide all undisputed funds that the client is entitled to receive. Similarly, when a client asks for information regarding how much money the lawyer is holding for the client or what the lawyer has done with money held for the client, the lawyer must promptly provide the information.

Lawyers may not deposit or otherwise commingle funds belonging to the lawyer or their law firm in the client trust account. If the lawyer becomes entitled to funds in the client trust account, the lawyer must withdraw the funds at the earliest reasonable time. If a client disputes the lawyer or law firm's right to receive a portion of the funds in the client trust account, the disputed portion of the funds may not be withdrawn until the dispute is resolved.

Let me stress again: Proof that the defendant violated one or more of his professional duties under California law does not, without more, mean that he is guilty of any crime. That is, a lawyer can violate his ethical duties under California law without having the intent required to commit a crime. The question you must decide with respect to the first two elements of Count One is whether the defendant knowingly, willfully, and with the intent to defraud, devised or participated in a scheme or artifice to defraud or to obtain money or

> property by materially false and fraudulent
> pretenses, representations or promises as alleged
> in Count One of the Indictment — not whether he
> violated his ethical obligations.

(2A.555-57, SPA.6-12).

At the charge conference, Avenatti had repeatedly objected to these instructions in their entirety, contending that the Professional Duties charge misstated the law, was irrelevant to a determination of criminal guilt, directed a verdict, weakened the burden of proof by converting the case into an attorney grievance proceeding, and was highly prejudicial, citing, *inter alia, People v. Stein*, 94 Cal.App. 3d 235, 239 (1979) (2A.463-64, 473-75, 477, SPA.3). He proposed that, should the court deny the objection, that it instruct only using the exact language of the applicable Rules of Professional Conduct, without commentary (2A.474).

Following the final charge, Avenatti renewed his objections and separately moved for a mistrial as to the language that "misappropriation of client funds is a particularly serious ethical violation of a lawyer's ethical duty of loyalty," contending that it constituted improper commentary and opinion, suggested he had in fact misappropriated money, was prejudicial, and transformed the case into

a determination of whether he had violated the duty of loyalty rather than a federal criminal statute (2A.561, 575).

## C. **The Court's Coercive Instruction in Response to the Final Jury Note, Shortly Before the Verdict Is Announced**

The jury began deliberating at 2:48 p.m. on February 2, 2022 (2A.563). It sent out a note at 10:37 a.m. the next morning, stating, "We are unable to come to consensus on Count 1. What are our next steps?" (SPA.41). At both parties' request, the court issued a brief, modified *Allen* instruction telling jurors to continue deliberating, to examine others' views and reexamine their own, to not hesitate to change their opinion, but to not surrender their honest convictions (3A.565-66, SPA.45).

At 2:10 p.m., the jury sent a note requesting a full transcript of Clifford's testimony; and for the court to define "good faith" (3A.566, SPA.42). The jury was provided with the transcript and, at 3:21 p.m., the court recharged the jury on the good-faith defense in substantively similar language as the final charge (3A.571, SPA.46).

The next day, at 10:02 a.m., the jury sent a note reading, "We have one juror who is refusing to look at evidence and is acting on a feeling. We need assistance on moving forward. She does not believe she

27

needs to prove her side using evidence and refuses to show us how she
has come to her conclusion. *Please* help us move forward. Not going on
any evidence, all emotions and does not understand this job of a jury"
(3A.576, SPA.43 (T.1817); emphasis in original). The government
requested, pursuant to *United States v. Baker*, 262 F.3d 124 (2d Cir.
2001), that the court inquire and decide whether to excuse her for
refusal to deliberate (3A.576).

Avenatti contended that it was "obvious the jury is deadlocked"
and asked for a mistrial (3A.577). He argued that the note should not be
viewed in isolation; rather, in context, it was clear that the juror had
been cooperative and deliberated over the last two days, and had
reached a conclusion rather than refused to deliberate (3A.577). After
all, the court had instructed jurors the day before about not
surrendering an honest conviction, and on their right to fail to agree,
and "all indications are that this juror did exactly what you instructed"
(3A.577 (T.1822)). Thus, the court should not coerce or single her out,
but rather declare a mistrial (3A.577-78).

After the court denied the motion, Avenatti objected to the court's
proposed response, arguing, *inter alia*, that the instruction for jurors to

28

tell the court if anyone was refusing to deliberate was coercive and threatening, and asked that it only re-read the final "duty to deliberate" and "bias or sympathy" instructions, and reiterate the burden of proof and reasonable doubt instructions (3A.578-79).

The court added several lines to the charge reiterating the burden of proof, but otherwise adhered to its proposal (3A.579-80). Thus, at 11:55 a.m., the court responded to the note as follows:

> At the beginning of this case, you each took an oath to well and truly try this issue and a true verdict give according to the law and the evidence.
>
> Pursuant to that oath, each of you has a duty to deliberate. That entails a duty to consult with one another, to consider each other's views with an open mind, and to discuss the evidence with the objective of reaching a just verdict if you can do so.
>
> Under your oath as jurors, you are not to be swayed by sympathy or emotion. You should be guided solely by the evidence presented during the trial and the law as I gave it to you, without regard to the consequences of your decision. You have been chosen to try the issues of fact and reach a verdict on the basis of the evidence or lack of evidence. If you let sympathy or emotion interfere with your clear thinking, there is a risk that you will not arrive at a just verdict. You must make a fair and impartial decision so that you will arrive at a just verdict.

Your verdict must be based on the evidence introduced at trial or the lack of evidence. But I remind you the defendant has no burden to present any evidence. As I have told you many times, the burden of proof lies solely with the government.

As you deliberate, you should examine the questions put to you with candor and with a proper regard and deference to the opinions of each other. If, after listening to your fellow jurors, and if, after stating your own view, you become convinced that your view is wrong, do not hesitate because of stubbornness or pride to change your view. On the other hand, if you have honest convictions and beliefs based on the evidence presented at trial, you should not surrender those convictions and beliefs solely because of the opinions of your fellow jurors or because you are outnumbered.

I remind you that your verdict must be unanimous. Further, you are reminded that, if at any time you are not in agreement, you are not to reveal the positions of the jurors, including a split of the vote, to anyone, including me, at any time during your deliberations.

With that, I will ask you to return to the jury room to continue your deliberations. I am going to give you copies of the instructions that I just read to you, as well as the instructions I read to you yesterday in response to your first two notes. You should consider all of these instructions along with all of my other instructions in reaching a verdict in this case. If, at any point in your deliberations, anyone on the jury is refusing to deliberate in accordance with my instructions, you are free to send us another note. And, of course, if you have

30

> any additional questions or concerns, you can always send us another note as well.

(3A.580-81, SPA.47).

The jury announced it had a verdict at 2:33 p.m., and found Avenatti guilty of both counts (3A.582, SPA.48).

### D. **Sentencing**

Avenatti was subject to a mandatory term of two years' consecutive imprisonment for the aggravated identity theft count (PSR ¶¶117-18). As to the wire fraud count, the Probation Department calculated the base offense level as 7, plus 2 levels for abuse of a position of public trust, and 12 additional levels under U.S.S.G. §2B1.1(b)(1)(G), based on its loss calculation of $297,500 (both the second and third book payments), for a total of 21 (PSR ¶¶31-36). He was in criminal history category II (PSR ¶ 43).

The defense objected to the loss calculation "because it is undisputed that Mr. Avenatti gave Ms. Clifford a sum of money equivalent to the second book-advance installment, and the facts at trial do not establish by a preponderance of the evidence that he did so after 'the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim,'"

31

quoting U.S.S.G. § 2B1.1, cmt. 3(E)(i)(II) (3A.604, SPA.50). It also argued that any loss amount should be reduced because "Avenatti expended considerable time, energy, and resources on Ms. Clifford, including hundreds of thousands of dollars, for which he was never fully reimbursed or compensated" (3A.605, SPA.50-51). Under the first argument, his offense level would be 17; under the second, his offense level would be 9.

The government argued that the loss amount was correctly calculated because Avenatti had not returned the same money he purportedly stole from Clifford, citing *United States v. Fumo*, 655 F.3d 288, 312-13 (3d Cir. 2011), and contended the trial evidence showed Avenatti returned the money to forestall her imminent discovery of its loss (3A.619-20). Moreover, it argued, Avenatti was fully compensated for his efforts on behalf of Clifford through the $100 retainer and legal defense fund (3A.620).

At the sentencing hearing, the district court found loss in the amount of $297,500 (3A.628). While it declined to rule on whether it was necessary that Avenatti returned the same money allegedly stolen, as the government argued, it found that he only returned the money

because Clifford was about to detect the alleged theft (3A.628, SPA.53). It also ruled that that no authority "supports a view of loss of the sort that he presents" under U.S.S.G. § 2B1.1, cmt. 3(E), citing *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009), and found that he had received adequate compensation for services rendered to Clifford, such that he could not reduce the loss amount (3A.628, 630, SPA.53-54).[11]

Thus, the court adopted the Probation Department's determinations in totality and found that the guidelines range for the wire fraud count was 41 to 51 months' imprisonment, in addition to the mandatory consecutive 24-month term for aggravated identity theft (3A.630). Varying downward, it imposed an aggregate sentence of 48 months' imprisonment, with 18 months to be served concurrent to his sentence under *Avenatti*, 19-cr-373, plus three years of supervised release (3A.640-41).

The court also ordered $297,500 in forfeiture, and imposed mandatory restitution in the amount of $148,750 (3A.640). In response to a request from defense counsel, as to which the government took no

---

[11] The court also denied the defense request for a downward departure to criminal history category I under U.S.S.G.§4A1.3(b), a ruling that is not appealable.

position, it explicitly ordered that restitution to Clifford begin after restitution to the victim in *Avenatti*, 19-cr-373, was completed (3A.641, SPA.62). The judgment entered that day reflected this, stating that restitution would "commence after restitution payments are completed in 19-CR-373 (PGG)" (3A.647,SPA.63).

## E. **The Restitution Order**

In an order entered on September 23, 2022, the court reiterated the restitution amount and terms it imposed on Avenatti at sentencing and in the judgment, except that the order switched the victim priority: "Payments made by the defendant shall be distributed to the individual victim in this case prior to any payments made . . . toward the restitution order in *United States v. Michael Avenatti*, 19 Cr. 373 (PGG), Dkt. No. 376" (3A.652, SPA.65).

34

## SUMMARY OF ARGUMENT

In charging the jury on wire fraud, the court delivered a lengthy instruction on the professional duties of lawyers, ostensibly to help jurors determine whether Avenatti had violated a duty to disclose that rose to a fraudulent misrepresentation under 18 U.S.C. §1343. Most of the charge was irrelevant, however, and risked confusing and misleading the jury into thinking that this federal criminal trial was, instead, an attorney grievance proceeding. Moreover, the charge was imbalanced and injected the court's personal opinion and commentary into deliberations. Since this trial began and ended with Avenatti's legal representation of Clifford, he was gravely prejudiced by this charge. The Court should reverse.

The jury reported deadlock two times. The first time, on the second day of deliberations, the court gave a brief, modified *Allen* charge. The jury continued to deliberate through that day. The second time the jury reported deadlock, however, on the third day, the court issued a supplemental instruction that squarely targeted the holdout, repeatedly insisted on the duty of jurors to "arrive at a just verdict," and ended by telling jurors to send out another note if one of them refused to

deliberate. In the context of this case and from the viewpoint of the minority juror, the court's supplemental instruction was impermissibly coercive and warrants reversal. *United States v. Haynes*, 729 F.3d 178, 193 (2d Cir. 2013).

At sentencing, the defense contested the loss assigned to increase his offense level under the Guidelines, U.S.S.G. § 2B1.1(b)(1), contending that the $297,500 amount should be reduced by the money he returned to Clifford and the value of the legal services he performed for her. Because the court denied the request based on clearly erroneous factual findings and committed legal error in ruling that "no authority" supported it, the sentence should be vacated and resentencing ordered.

Finally, the restitution order entered in this case contradicted the restitution orally imposed at sentencing and in the written judgment. The Court should remand the case for correction.

# ARGUMENT

I. **The Court Erred in Delivering a Lengthy and Prejudicial Final Charge on the Professional Duties of Lawyers That Was Largely Irrelevant, Risked Serious Juror Confusion, Turned the Criminal Trial Into an Attorney Grievance Proceeding, and Improperly Injected the Court's Own Beliefs and Commentary Into Deliberations.**

The government built its entire case on Avenatti's legal representation of Clifford, from retention to termination. Witness after witness described his conduct as a lawyer, and countless documents about his financial and legal dealings were admitted into evidence. Against this backdrop, the court gave the jury a lengthy and detailed final charge on the ethical duties of a lawyer under the California Rules of Professional Conduct. Almost all of the duties discussed, however, were irrelevant and extraneous to the purpose for which the charge was administered, *i.e.,* to define, in this wire fraud trial, a lawyer's duty to disclose information and whether non-disclosure can rise to a fraudulent misrepresentation under 18 U.S.C. § 1343. Moreover, the charge was not even-handed and balanced. The court, at one point, even told the jury that, "misappropriation of client funds is a particularly serious violation of a lawyer's ethical duty of loyalty."

37

Given the context of this particular case, the professional duties instruction turned this federal criminal trial into an attorney grievance proceeding. The charge was irrelevant, confusing, and misled the jury. *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014). Moreover, it was imbalanced, injected the judge's personal opinion and improper commentary into deliberations, and invaded jurors' province. *United States v. Persico*, 349 F.2d 6, 10 (2d Cir. 1965). Because Avenatti and his good faith defense were gravely prejudiced as a result, reversal is required.

## A.  <u>Standard of review</u>

The propriety of a particular jury instruction is a question of law this Court reviews *de novo. Kopstein*, 759 F.3d at 172. The objected-to instruction must be evaluated in the context of the entire jury charge and record as a whole. *United States v. Dove*, 916 F.2d 41, 45 (2d Cir. 1990).

## B. <u>Reversal is Required Due to the Highly Prejudicial Jury Instruction Regarding the Professional Duties of Lawyers.</u>

Given that Avenatti was an attorney and Clifford his client, the court was permitted to instruct the jury in this wire fraud trial, as it did, that the "failure to disclose information may . . . constitute a

38

fraudulent representation if the defendant was under a . . . professional . . . duty to make such a disclosure" (2A.554). *See* Sand, Modern Federal Jury Instructions § 44.04, at 44-4. However, what it was not permitted to do was turn the case into an attorney grievance proceeding, inject its personal opinion, usurp the function of the jury, or mislead or confuse it.

But that is precisely what happened here. The court delivered a lengthy and overly detailed charge on the California Rules of Professional Conduct. The charge delved into, among numerous other topics: the duty of loyalty; misappropriation of client funds; who gets to define the objectives of representation; acting without authorization; abiding by decisions; implied authorization; the impairment of a client's substantial rights and claims, including settlement or stipulation; the duty of reasonable communication; the duty of reasonable consultation; full and frank disclosure; written fee agreements and their requirements; client trust accounts; the obligation to provide information about funds; the duty to provide funds to the client; commingling; the withdrawal of funds and when that can occur; and so on.

39

The length and complexity alone of the charge risked juror confusion. *See United States v. McCracken,* 488 F.2d 406, 414 (5th Cir. 1974) ("Unnecessarily long and repetitive instructions increase the danger that the jury will perceive inconsistencies, become confused, and be unduly impeded in properly exercising its functions"). Further, of all the topics that were discussed, only the duties related to reasonable communication arguably were relevant to the instruction that the court was elucidating*, i.e.,* non-disclosure of information as a form of fraudulent representation. The rest of the charge's pages and pages was extraneous and irrelevant to that inquiry.

However, that the charge was irrelevant does not mean it did not matter. To the contrary, in this particular case, it mattered a lot. Even assuming *arguendo* that this New York district court's instructions on the duties of a California lawyer were accurate, "[a] legally accurate but irrelevant jury instruction may be error to the extent it misleads the jury." *United States v. Wisecarver*, 644 F.3d 764, 772 (8th Cir. 2011). The entire case revolved around Avenatti's representation of Clifford, from start to finish. A jury could not help but apply the inapplicable ethical rules to the testimony, and then ask itself whether he had

violated rules of professional responsibility that were irrelevant to the task at hand – adjudging his guilt of wire fraud.

For example, one portion of the charge concerned the prohibition against commingling funds (2A.556). The jury heard extensive evidence of transfers between various Avenatti firm banking accounts, including to and from Clifford's client trust account. Any reasonable juror could not help but wonder, upon hearing the court's charge, whether commingling had occurred. There was no proof that it did, of course. And in fact whether he commingled funds, under the meaning of California's Rules of Professional Conduct, was irrelevant to whether Avenatti had made a fraudulent representation through non-disclosure, as relevant to a trial under 18 U.S.C. § 1343. But there was a very real danger that jurors would be confused, conclude that he had commingled funds based on the testimony, and decide he was an unethical lawyer deserving of punishment. As this Court has observed, "[o]bjectionable instructions are considered in the context of the entire jury charge, and reversal is required where, based on a review of the record as a whole, the error was prejudicial or the charge was highly confusing." *Kopstein*,

759 F.3d at 172  (quoting *Hudson v. New York City*, 271 F.3d 62, 67 (2d Cir.2001)).

  This is but one example. The length and detailed nature of the professional conduct instructions allowed the jury to do this over and over, by cherry-picking the testimony of the government witnesses – most especially that of Clifford, who admitted to outright hostility toward Avenatti, had serious credibility issues, and depicted him in a very negative light – and turning the trial into an attorney grievance proceeding writ large.

  The defense was thus entirely correct in bringing to the court's attention *People v. Stein*, 94 Cal. App. 3d 235 (Ct. App. 1979). In *Stein*, the court instructed the jury that evidence had been presented at trial that the defendant "may have violated" rules of professional conduct, and this may be considered "as it may tend to prove that the defendant possessed the specific intent required." *Id.* at 239. The California Court of Appeal held that the violation of the rules was not relevant to the issue of intent, and that it prejudiced the defendant because it "tended to discredit defendant and to corroborate the prosecution's case." *Id.* at 240. *Cf. State v. Mahoney*, 188 N.J. 359, 908 A.2d 162 (2006) (court's

42

failure to properly explain how jury was to apply professional rules in attorney's criminal theft trial was error; "the unexplained admission of a rule of attorney conduct carries the certain risk that the jury could conflate the Rule's requirements with those necessary for the imputation of criminal liability).

The erroneous charge here was similarly prejudicial. It allowed the jurors to consider whether Avenatti had misbehaved as an attorney in scores of ways not relevant to wire fraud, and this operated to bolster the prosecution's case and thoroughly discredit him and his defense of good faith entitlement to the funds at issue. *See Kopstein,* 759 F.3d at 173 (a charge that causes "juror confusion is almost certainly not harmless if it pertains to a defendant's 'only' or 'primary' defense"). In this regard, the charge, too, was imbalanced. While a court has wide discretion to decide how it will charge the jury, "the discretion of the court is circumscribed by the requirement that the charge be fair to both sides." *United States v. Allen*, 127 F.3d 260, 264–65 (2d Cir. 1997). A charge that marshalled what, in the court's view, amounted to Avenatti's failings as a lawyer, and allowed the jury to discount his defense, certainly was not fair to him.

43

Worst in this regard was the court's statement at the very
beginning that "[t]he misappropriation of client funds is a particularly
serious violation of a lawyer's ethical duty of loyalty" (2A.555). As
Avenatti pointed out in his mistrial motion, this was not instruction,
but improper commentary. It conveyed the court's opinion, not a neutral
rule. It did not even relate to the duty of communication or disclosure,
the ostensible purpose of the professional duties instruction in the first
place. This was as far from even-handed as one could get.

"[A] court must strive for 'that atmosphere of perfect impartiality
which is so much to be desired in a judicial proceeding.'" *Santa Maria
v. Metro-N. Commuter R.R.*, 81 F.3d 265, 273 (2d Cir. 1996) (quoting
*Glasser v. United States*, 315 U.S. 60, 82 (1942)). And this Court has not
hesitated to reverse in cases like this, when a charge "conveyed to the
jury too strong an impression of the court's belief in the defendant's
probable guilt to permit the jury freely to perform its own function of
independent determination of the facts." *Persico*, 349 F.2d at 10
(quoting *United States v. DeSisto*, 289 F.2d 833, 835 (2d Cir. 1961)). *See
also United States v. Assi*, 748 F.2d 62, 66 (2d Cir. 1984) (reversing due
to charge that, *inter alia,* "used inflammatory language"); *McCracken*,

44

488 F.2d at 414 (because "every criminal defendant has a right to trial by an impartial jury whose verdict is not commanded, coerced, or unduly influenced by the trial judge," "[i]nstructions must not . . . be argumentative or slanted in favor of either side").

Of course, the court did not outright say that Avenatti misappropriated Clifford's money. But the strong implication of its forceful statement about the "particularly serious" nature of client theft was that it held this belief. *Cf. United States v. Tourine*, 428 F.2d 865, 869–70 (2d Cir. 1970) (affirming where, in charge, judge did not "try to impose his own opinions and conclusions as to the facts on the jury and does not act as an advocate in advancing factual findings of his own"). The injection of the court's beliefs mattered greatly. This was a criminal trial, held to adjudicate precisely this question beyond a reasonable doubt, *i.e.,* whether Avenatti had wrongly withheld Clifford's money. Inasmuch as the court's opinion substituted for the jury's own finding on the ultimate issue, it served to remove this element from its consideration. *United States v. Ferguson,* 676 F.3d 260, 275 (2d Cir. 2011) (error to direct verdict on element of crime)

45

Had the court adopted Avenatti's request that it merely charge the applicable California Rule of Professional Conduct, without commentary, all of these problems would have been eliminated. Rule 1.4, Communication with Clients, reads:

> (a) A lawyer shall:
> (1) promptly inform the client of any decision or circumstance with respect to which disclosure or the client's informed consent is required by these rules or the State Bar Act;
>
> (2) reasonably consult with the client about the means by which to accomplish the client's objectives in the representation;
>
> (3) keep the client reasonably informed about significant developments relating to the representation, including promptly complying with reasonable* requests for information and copies of significant documents when necessary to keep the client so informed.

This was an accurate statement of the law. *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004). It was simple to understand, contained no confusing, extraneous information, and was limited to only the issue as to which it was relevant, *i.e.,* an attorney's professional duty of disclosure and how that relates to misrepresentations in wire fraud prosecutions. *McCracken,* 488 F.2d at 414 ("Instructions should be as succinct, clear and consistent as possible given their intended function

46

and the nature of the particular case"). And, importantly, it was balanced, free from improper commentary, and even-handed. *Contrast Persico*, 349 F.2d at 10.

In sum, the court's imbalanced, overlong, and mainly irrelevant charge on the California Rules of Professional Conduct turned Avenatti's criminal trial into a civil attorney grievance proceeding. Given that the entire trial was about his representation of Clifford, and his defense predicated on good faith, the error infected the deliberations. Reversal of the wire fraud count and remand for a new trial is required. *Kopstein*, 759 F.3d 168; *Persico*, 349 F.2d 6. Because the aggravated identity theft count required that the jury find Avenatti guilty of wire fraud, SPA.48, it, too, must be reversed and remanded.

47

## II. The Court's Supplemental Instruction In Response to the Jury's Second Declaration of Deadlock, Which Singled Out the Holdout Juror and Insisted That a Verdict Be Returned, Was Impermissibly Coercive.

The jury here reported deadlock very early in deliberations. Although it apparently tried to follow the court's modified *Allen* instruction in response to its deadlock declaration, and thereafter requested testimony and reinstruction, the deadlock apparently continued until it exploded into view again on the third day. Then, the jury sent out a note complaining about a single juror using "emotion" and "feeling" who did not "understand" the jury's "job." The court responded to this note with a supplemental instruction that interwove exhortations for jurors to put aside sympathy along with repeated insistence on the duty of jurors to "arrive at a just verdict," and ended by telling jurors to send out another note if one of them refused to deliberate. As the defense objected, in the context of these deliberations, this charge singled out the holdout juror and was impermissibly coercive. Accordingly, reversal and remand for a new trial is required.

### C. Standard of review

This Court reviews a district court's giving of a charge to a deadlocked jury pursuant to an abuse of discretion standard. *See United*

48

*States v. Crispo,* 306 F.3d 71, 77 (2d Cir. 2002). "Reversal is appropriate when the charge tends to coerce undecided jurors into reaching a verdict." *Id.*

### III. The Court's Supplemental Instruction In Response to the Jury's Second Declaration of Deadlock, Which Singled Out the Holdout Juror and Insisted That a Verdict Be Returned, Was Impermissibly Coercive.

The jury here reported deadlock very early in deliberations. Although it apparently tried to follow the court's modified *Allen* instruction in response to its deadlock declaration, and thereafter requested testimony and reinstruction, the deadlock apparently continued until it exploded into view again on the third day. Then, the jury sent out a note complaining about a single juror using "emotion" and "feeling" who did not "understand" the jury's "job." The court responded to this note with a supplemental instruction that interwove exhortations for jurors to put aside sympathy along with repeated insistence on the duty of jurors to "arrive at a just verdict," and ended by telling jurors to send out another note if one of them refused to deliberate. As the defense objected, in the context of these deliberations, this charge singled out the holdout juror and was impermissibly coercive. Accordingly, reversal and remand for a new trial is required.

49

D. __Standard of review__

This Court reviews a district court's giving of a charge to a deadlocked jury pursuant to an abuse of discretion standard. *See United States v. Crispo,* 306 F.3d 71, 77 (2d Cir. 2002). "Reversal is appropriate when the charge tends to coerce undecided jurors into reaching a verdict." *Id.*

E. __Evaluated in Context, from the Viewpoint of the Minority Juror, the Supplemental Instruction Singled Her Out and Was Coercive__

When a trial judge issues a supplemental instruction to a divided jury, its propriety turns on whether the charge "tends to coerce undecided jurors into reaching a verdict — that is, whether the charge encourages jurors to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." *United States v. Vargas-Cordon*, 733 F.3d 366, 377 (2d Cir. 2013) (internal quotation marks omitted). The instruction is evaluated from the viewpoint of a juror in the minority position. *See Smalls v. Batista,* 191 F.3d 272, 280–81 (2d Cir. 1999).

Whether there has been coercion requires "an individualized determination," *Crispo*, 306 F.3d at 77; the Court must "consider the

50

supplemental charge given by the trial court in its context and under all the circumstances." *Lowenfield v. Phelps,* 484 U.S. 231, 237 (1988) (internal quotation marks omitted); *United States v. Haynes*, 729 F.3d 178, 193 (2d Cir. 2013) (the question is whether the charge "was coercive in the circumstances and context in which it was given"). "Special caution is appropriate to avoid coercion" where "the court knows that a lone juror is deadlocking the jury," especially "when the holdout is aware that his position is known to the judge." *United States v. Pirro*, 9 Fed. Appx. 45, 49 (2d Cir. 2001) (summary order).

In this case, the jury struggled to reach a verdict from the very beginning. In its very first note, sent on the morning of the second day of deliberations, it reported deadlock — jurors were "unable to come to a consensus on Count 1" (SPA.41). Its second note, early that afternoon, asked for the transcript of Clifford's testimony, and for the court to define "good faith" (SPA.42). These two requests went to the very heart of the case: Clifford's allegations against Avenatti, and his defense to them.

After deliberating the rest of that afternoon, the jury sent a note the next morning indicating that the existing deadlock had deepened:

"We have one juror who is refusing to look at evidence and is acting on a feeling. We need assistance on moving forward. She does not believe she needs to prove her side using evidence and refuses to show us how she has come to her conclusion. *Please* help us move forward. Not going on any evidence, all emotions and does not understand this job of a jury" (SPA43).

At this point, it was evident that the jury could not possibly reconcile and come to an uncoerced verdict. It had been experiencing deadlock since the inception of deliberations. The court had responded to that first note appropriately, with the parties' assent, by giving a brief, modified *Allen* charge telling jurors to continue deliberating, to examine others' views and reexamine their own, to not hesitate to change their opinion, but to not surrender their honest convictions (SPA.45). Seemingly, the jurors took the *Allen* charge seriously and tried in good faith to deliberate, as indicated by their request for evidence and recharging. But by the time of the second note reporting deadlock on the morning of the third day, the division had ripened into true, irreconcilable inability to reach verdict.

52

Moreover, the tone of the last note was bitter and acrimonious. The foreperson accused a single juror of "refusing to look at evidence," "acting on a feeling," and refusing to "show" or "prove" to the other jurors how she had arrived at her conclusion, and maligned her for "not understand[ing] this job of a jury" (SPA.43).

From the viewpoint of the minority juror targeted by the foreperson, the jury room had to be a very tough place when this note came out. Jurors knew that notes were disclosed in open court, that the judge would read it aloud to the audience in this closely watched, high-stakes trial, and that it would then be re-read aloud with all jurors together. Things had to have gone very wrong for a note like this to be written.

In this context, given this course of deliberations, and from the viewpoint of the holdout juror, the court's supplemental instruction undoubtedly was coercive. The court started by reminding jurors they had taken an oath to render a "true verdict." It then exhorted jurors that they were sworn to "consult with one another, to consider each other's views with an open mind, and to discuss the evidence with the objective of reaching a just verdict if you can do so" (3A.580). Nobody

53

could have missed that this response was aimed squarely at the sole holdout who supposedly did not "understand" how to be a juror. As Avenatti pointed out, however, at this point "all indications [were] that this juror did exactly what you instructed" but was simply "unwilling to change her position" (2A.577).

If this singling out of the holdout was not obvious enough, the court next moved on to repeatedly disclaiming the role of "sympathy or emotion" in rendering a verdict. It even stated, "If you let sympathy or emotion interfere with your clear thinking, there is a risk that you will not arrive at a just verdict. You must make a fair and impartial decision so that you will arrive at a just verdict." (2A.581). The import of this instruction was plain: the foreperson was right, the holdout juror accused of relying on sympathy and emotion was wrong, and she had ("must") come to a unanimous verdict despite an opinion that apparently had been formed early in deliberations and continued throughout. *Compare Lowenfield*, 484 U.S. at 235 (jury was instructed that it was their duty to consult and consider each other's views "with the objective of reaching a unanimous verdict if you can do so without violence to that individual judgment;" jury was specifically advised of

54

option of not reaching a verdict); *United States v. McDonald,* 759 F.3d 220, 223 (2d Cir. 2014) (judge's language was mild, and "asked only that the jury continue deliberations 'to see whether' a unanimous verdict were possible"); *Spears v. Greiner*, 459 F.3d 200, 206-07 (2d Cir. 2006) (jury instructed to attempt to reach a verdict if possible).

The court ended the instruction with possibly the most coercive aspect of its response: an invitation that the other jurors "tell on" the holdout juror if she adhered to her views. The court sent them back to the jury room, stating, "If, at any point in your deliberations, anyone on the jury is refusing to deliberate in accordance with my instructions, you are free to send us another note" (3A.581). In other words, the court told jurors they were free to, in essence, shame the holdout again with another note. Faced with this prospect, it is unsurprising that the minority juror relented and that the jury reached a verdict within 2½ hours.

This Court has observed that "when an *Allen* charge directs jurors to consider the views of other jurors, specific cautionary language reminding jurors not to abandon their own conscientious beliefs is generally required." *Spears*, 459 F.3d at 205. It is true that the court

55

employed such language in its response, and within the modified *Allen* charge it gave after the first note. But that language was negated by the court's reminders that jurors had sworn an oath to come to a verdict, and its repeated insistence that the jury "make a fair and impartial decision" and "arrive at a just verdict." "A reasonable juror could view this instruction as lending the Court's authority to the incorrect and coercive proposition that the only just result was a verdict." *Haynes*, 729 F.3d at 194. *See also Jenkins v. United States*, 380 U.S. 445, 446 (1965) (judge's instruction that, "You have got to reach a decision in this case" was coercive; reversed).

It also is true that the court had to address, in some fashion, the note's complaints about "sympathy" and "emotion." But the defense request that the court do so only by re-reading the final "duty to deliberate" and "bias or sympathy" instructions would have done so. Unfortunately, what the court did here, was *interweave* sympathy/emotion instructions with an *Allen* charge exhorting jurors to reach a verdict. This operated to single out the holdout juror and inescapably contrast her position with the majority's. *See Haynes*, 729 F.3d at 193 (noting that the original *Allen* charge was criticized

56

"because it focused on the suggestion that jurors in the minority should reconsider their position. In more recent times, courts have tended to use charges that do not contrast the majority and minority positions").

In the end, the defense objections to the supplemental instruction were correct. In the context of this particular case, it was clear that the jury had been deadlocked from inception; had honestly tried in good faith to deliberate and zeroed in on the important issues at trial; but was deadlocked still, and possibly growing tense and frustrated at the impasse. Under these circumstances, this second *Allen*-type charge – speaking directly to and singling out the holdout juror the majority was complaining about, and focusing insistently on the jurors' duty to reach a verdict, not *whether* they could – was impermissibly coercive. *Haynes*, 729 F.3d at 193. Because the instruction "tend[ed] to coerce undecided jurors into reaching a verdict," *Crispo*, 306 F.3d at 77, it was an abuse of discretion.

Accordingly, this Court should reverse and remand for a new trial.

57

**IV.** **The District Court Erred in Determining that the Loss Amount Was $297,500 Because the Second Book Payment of $148,750 Was Returned and Because the Loss Amount Should Have Been Reduced By the Value of Services Avenatti Rendered to Clifford.**

In wire fraud cases, the calculation of a defendant's guidelines offense level begins with a base level of seven, which then rises quickly with loss amount, following the loss table in U.S.S.G. § 2B1.1(b)(1). The district court here found that the loss amount was $297,500, comprising both the second and third book payments, and this resulted in a 12-level increase to Avenatti's offense level.

However, under the guidelines, Avenatti was entitled to credits against this loss amount. U.S.S.G. § 2B1.1(b)(1) app. n. 3(E)(i)(II). First, he returned the second book payment of $148,750 to Clifford before she detected the alleged crime or was about the detect it. Second, he provided her with significant legal services throughout 2018, the value of which should have been deducted. Because the district court erroneously declined to apply these reductions to the loss amount, despite the defense requests that it do so, the sentence should be vacated and resentencing ordered.

58

## A.  Standard of review.

A sentencing judge procedurally errs when the judge "makes a mistake in its Guidelines calculation . . . or rests its sentence on a clearly erroneous finding of fact." *United States v. Wernick,* 691 F.3d 108, 113 (2d Cir. 2012) (quotations omitted); *see also Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Cavera,* 550 F.3d 180, 189-90 (2d Cir. 2008) (en banc). The sentencing court's factual findings, including as to disputed loss amounts, must be supported by a preponderance of the evidence. *See United States v. Brennan*, 395 F.3d 59, 74 (2d Cir. 2005). Findings of fact will be overturned if they are clearly erroneous. *See, e.g., United States v. Skys,* 637 F.3d 146, 152 (2d Cir. 2011). This Court reviews *de novo* the district court's legal determinations. *United States v. Leon*, 663 F.3d 552, 554 (2d Cir. 2011).

## B.  The Credits Against Loss Rule.

Under Application Note 3(E)(i) to U.S.S.G. § 2B1.1, entitled Credits Against Loss, a defendant's loss for guidelines purposes will be reduced by "[t]he money returned . . . before the offense was detected." The time of detection is either "(I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew

or reasonably should have known that the offense was detected or about to be detected . . ." *Id. See generally United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009) (discussing commentary and recognizing that defendant entitled to credit for amounts repaid to victim). The Credits Against Loss rule recognizes that "the amount of loss in a fraud case, unlike that in a theft case, often depends on the actual value received by the defrauded victim." *United States v. Nagle*, 803 F.3d 167, 180 (3d Cir. 2015) (quotation omitted).

### C. <u>Avenatti Returned the Second Book Payment Before the Alleged Crime Was Detected or About to Be Detected.</u>

Here, it was undisputed that Avenatti ultimately gave Clifford $148,750, the amount of the second book payment. The only question at issue between the parties that was reached by the court, therefore, was whether the trial evidence proved by a preponderance of the evidence that, at the time he gave her the funds on September 5, Clifford had detected or was about to detect that Avenatti had received the second book payment of $148,750 but not yet turned it over to her.

The record was insufficient to prove this. On September 4, the day before Avenatti paid her, Clifford provided him with new banking information to use for the payment. This demonstrated her belief, at

60

that time, that the payment would be forthcoming – not that it had

been wrongly withheld. The day after, when she ultimately was paid,

she reached out to Avenatti again. But she did not confront him, or

question him, or indicate any sort of suspicion. Notably, when she

learned of the withholding of the third payment, that is exactly what

she did, almost immediately – she confronted Avenatti. The fact that

she did not on September 5 was strong proof that she had not detected

what had gone on, and was not close to doing so.

And in fact, Clifford did not learn anything about the timing

issues with the second payment until she was told this by Beier and

Janklow in mid-February 2019. Moreover, with the third payment,

Clifford went months – from October to February – before her

suspicions were sufficiently roused to cause her to seek outside

information about what had transpired. Her patience then strongly

suggests that she was not even close, on September 5, after only a

month had gone by, to detecting that Avenatti had not immediately

given her the second payment.

The government made much of the fact that Clifford said she

would email the publishers on August 27. A.620. In fact, the evidence

showed that, even had she done so, she certainly would not have uncovered the missing payment: Beier and Janklow received numerous emails starting in November from her and her publicist about the third payment, yet never once responded to her. There is no reason to believe that they would have responded to her in August.

The record was thus entirely bereft of evidence that Clifford had detected, or was about to detect, that Avenatti had received but not yet passed on to her the second payment, when on September 5 he gave her the $148,750 to which she was entitled. A factual "finding is clearly erroneous when . . . the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008). Given the lack of evidence supporting it, the district court's finding that Clifford was about to detect the offense was just such a mistake. *See United States v. Drayer,* 364 F. App'x 716, 720 (2d Cir. 2010) (summary order) (district court's finding of higher loss amount than that supported by the trial testimony was clearly erroneous).

### D. **Avenatti Provided Substantial Legal Services to Clifford That Should Have Resulted in a Credit Against the Loss Amount.**

Under the guidelines, loss also "shall be reduced" by the "fair market value of . . . the services rendered" by the defendant to the victim. U.S.S.G. § 2B1.1, appn. n. 3(E)(i). *Byors*, 586 F.3d at 226 (loss must be offset by "'value' that has been conferred on victims in the form of . . . services rendered"). *See also United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998) ("value may be rendered even amid fraudulent conduct, and that in calculating intended loss, the district court should give credit for any legitimate services rendered to the victims"; quoting *United States v. Barnes*, 125 F.3d 1287, 1291 & n. 1 (9th Cir. 1997)).

Here, as the defense argued below, there was ample proof at trial that Avenatti rendered extensive legal services to Clifford in the course of his representation of her. There was the November 30 accounting entered into evidence by the government. It showed that, as of that date, four attorneys of his firm had worked 2,381 hours on 10 matters for her, totaling $1,638,390 at standard hourly rates, and the firm had incurred $635,434.18 of out-of-pocket expenses. Representation continued until mid-February, as well. While some of these expenses

63

were paid through the legal defense fund, the fund had only seen deposits of a quarter of that amount, $587,415. Clifford, seemingly, was satisfied with this accounting of the services rendered her: there was no evidence that she took exception to the statement of fees and costs, and she immediately resumed her close relationship with Avenatti thereafter. The district court, therefore, was incorrect in ruling that Avenatti had been adequately compensated for his services; the defense fund never came close to the fees and costs actually incurred.

Moreover, even apart from the undisputed accounting, there was much evidence at trial as to the extensive nature and scope of the services Avenatti provided to Clifford. Aside from the legal matters he and his firm handled, he negotiated the book deal for her, set up interviews, reviewed the contracts, advised her on hiring a literary agent, accompanied her to meetings, worked on the cover, wrote the forward, arranged the audiobook, reviewed the manuscript, legally reviewed the book and epilogue, and communicated with the publisher and agent constantly about Clifford, a mercurial author whose changes of heart and publicity efforts caused much consternation at St. Martin's and Janklow. Indeed, as early as October, St. Martin's was considering

64

not paying Clifford the fourth payment due to the unauthorized and ineffectual publicity she engaged in. Thus, even Clifford was forced to agree at trial that Avenatti and his firm did "a lot of work" for her in 2018, work that to Regnier, Avenatti's long-time office manager, was unusual and beyond the scope of most attorney-client agreements.

The district court rejected the "services rendered" theory of the Credits Against Loss rule out-of-hand, stating it found no authority supporting it and citing *Byors* for the opposite proposition. This was puzzling, at best; *Byors* is the leading case in this Circuit on this rule. In *Byors*, the wire fraud defendant argued that he used some of the ill-gained money for legitimate business purposes, *i.e.,* capitalization of his quarry, and maintained that these expenses should be treated as services rendered to the victim. The Court rejected this contention not because services rendered cannot be a legitimate credit against loss, but because his expenditures "conferred nothing of value and no benefit to his victims. . . . He rendered no 'services' to them . . . ." 586 F.3d at 226.

That was not true here. Avenatti's services resulted in a book deal on extremely favorable terms for Clifford, even though the publisher and agent feared, from the outset, that she would be unable to honor

the contract. His services also included legal representation and advice in 10 matters, at least through the end of 2018, and almost certainly longer, as Regnier testified that the firm continued to advance costs for Clifford and represent her through January 2019 – even though the legal defense fund took in no more money after November 2018.

This was not, therefore, a case where the defendant seeks credit for services that were part-and-parcel of the fraudulent scheme. *Cf. United States v. Rowland*, 826 F.3d 100, 116 (2d Cir. 2016) (affirming finding that defendant "would not have performed services for [victim] at all but for his planned cover-up"). The record is abundantly clear that Clifford benefitted tremendously from Avenatti's representation and that the alleged withholding of the third payment – the only one that should have counted toward the loss, *see* III.D, supra – was isolated.

This Court reviews *de novo* the district court's legal determinations. *Leon*, 663 F.3d at 554. Here, the district court misapprehended the application of U.S.S.G. § 2B1.1, its commentary and application note 3(E)(i), and *Byors*. Accordingly, this Court should not hesitate to find error. *See, e.g., Barnes*, 125 F.3d at 1291 ("In light of the extensive precedent acknowledging that value may be rendered

66

even amid fraudulent conduct, the district court erred in failing to award Appellant credit for the value of the services he provided satisfactorily"); *United States v. Klein*, 543 F.3d 206, 214-15 (5th Cir. 2008)(although physician was unlawfully dispensing drugs, the district court erred when it failed to discount the actual loss by the value of the drugs dispensed).

### E. <u>Vacatur and Remand Is Necessary.</u>

In sum, the district court erred by failing to credit Avenatti for money returned and valuable services rendered, leading to an erroneous calculation of Avenatti's offense level and, consequently, his guidelines range. That the court varied from the erroneously calculated range in imposing sentence is of no import: "an error in calculating the Guidelines range will taint not only a Guidelines sentence, if one is imposed, but also a non-Guidelines sentence, which may have been explicitly selected with what was thought to be the applicable Guidelines range as a frame of reference." *United States v. Guerrero*, 910 F.3d 72, 78 (2d Cir. 2018) (quoting *United States v. Fagans*, 406 F.3d 138, 141 (2d Cir. 2005)).

The sentence should be vacated and the case remanded for resentencing.

## V.  The Restitution Order Must Be Corrected to Conform to the Court's Oral Sentence and Written Judgment.

At the June 2, 2022 sentencing, the court explicitly directed that the restitution in this case begin after restitution in *United States v. Avenatti*, 19-cr-373 (S.D.N.Y.), was completed, and the judgment entered that day reflected this sentence. However, the September 23 restitution order reversed this payment order. This Court should remand and direct the district court to amend the clearly erroneous or mistaken order of restitution to conform to the restitution terms imposed at sentencing.

"[A] defendant has a constitutional right to be present when he is sentenced." *United States v. DeMartino*, 112 F.3d 75, 78 (2d Cir. 1997). *See also* Fed. R. Crim. P. 43(a) (requiring the defendant's presence at sentencing). In light of this rule, it is well-settled that it "is the oral sentence which constitutes the judgment of the court, and which is authority for the execution of the court's sentence." *United States v. Thomas*, 299 F.3d 150, 152 (2d Cir. 2002) (quoting *United States v. Marquez*, 506 F.2d 620, 622 (2d Cir. 1974)); *accord United States v.*

68

*Rosario*, 386 F.3d 166, 168-69 (2d Cir. 2004). By contrast, ancillary written documents such as the judgment are "nothing more than mere evidence of the sentence imposed orally in court by the judge.'" *Marquez*, 506 F.2d at 622.

Where the "unambiguous oral sentence conflicts with the written judgment, the constitutional right of a defendant to be present at sentencing dictates that the oral pronouncement of sentence must control." *United States v. A-Abras*, Inc., 185 F.3d 26, 29 (2d Cir. 1999). The same is true for other documents evidencing the oral sentence, including writings relating to restitution. *United States v. Fareri*, 712 F.3d 593, 595–96 (D.C. Cir. 2013) (where written list of payments due to restitution victim conflicted with oral sentence and judgment, "[t]he District Court's oral sentence . . . is controlling"). The proper remedy is to remand for amendment of the incorrect document. *United States v. Jacques*, 321 F.3d 255, 263 (2d Cir.) (written judgment); *Fareri*, 712 F.3d 593, 595–96 (list of victim payments); *accord United States v. Ramirez*, 344 F.3d 247, 255 (2d Cir. 2003).

At the sentencing hearing here, the district court ordered that payment of restitution in this case begin after restitution was completed

69

in Avenatti's other case, *United States v. Avenatti*, 19-cr-373 (PGG) (S.D.N.Y.). The judgment entered that day reflected this. However, the payment schedule was reversed in the restitution order entered in September 2022, with restitution in this case to begin immediately, not after satisfaction of the restitution in 19-cr-373. The court failed to acknowledge that the order's payment schedule differed from that orally imposed at sentence, make findings, or reference legal authority. Thus, any change almost certainly was not intentional, but rather the result of oversight and clerical mistake. Notably, the court explicitly imposed this particular restitution schedule at the sentencing hearing in response to a defense request, as to which the government took no position. Thus, there is no possible argument that the court misspoke when imposing sentence, rather than simply overlooked the contradictory schedule in the order.

Since the September 23 restitution order — intended to be "nothing more than mere evidence of the sentence imposed orally in court by the judge" — *Thomas*, 299 F.3d at 152, conflicts with the oral sentence, it must be corrected. *Jacques*, 321 F.3d at 263; *Fareri*, 712 F.3d 593, 595–96. Accordingly, the Court should remand to the district

70

court with directions that it issue a corrected restitution order conforming to the oral sentence imposed on Avenatti.

## CONCLUSION

For the foregoing reasons, Avenatti's convictions should be reversed and a new trial ordered (Points I & II); his sentence should be vacated and the case remanded for resentencing (Point III); or the case remanded for the court to enter an amended restitution order (Point IV).

Dated:      New York, New York
            December 16, 2022

Respectfully submitted,

_____ /s/ _____

Kendra L. Hutchinson
Federal Defenders of New York, Inc.
    Appeals Bureau
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8731
kendra_hutchinson@fd.org

*Counsel for Michael Avenatti*

---

## CERTIFICATE OF SERVICE

I certify that I have caused a copy of this Brief to be filed with the Court's CM/ECF system, which will effect service on all counsel of record.

Dated:　New York, New York
　　　　December 16, 2022

_____/s/_____
**KENDRA L. HUTCHINSON**

## CERTIFICATE OF COMPLIANCE

1.  This Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and 32(e), and Local Rule 32(a)(4)(A) because:

> this Brief contains 13,758 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.  This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this Brief has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch in Century Schoolbook type style.

Dated:    New York, New York
December 16, 2022

_____
/s/
**KENDRA L. HUTCHINSON**